UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIM. NO.: 2:24-cr-653 |
| vs. | **GOVERNMENT'S TRIAL BRIEF** |
| **DON MICHAEL RYNN** | |

TO:    The Honorable Richard M. Gergel

This trial brief is respectfully submitted to the Court to provide an overview of the Government's case, including the factual background and issues of law which may arise during the presentation of the Government's case-in-chief.

I.    **Facts**

***Background on NOAA, Trip Reports, Fish Limits, and Dealer Reports***

The federal commercial fishing industry is regulated by the National Oceanic and Atmospheric Administration ("NOAA"), which is an Executive Branch of the United States Government.  NOAA's National Marine Fisheries Service assists with the enforcement and regulation of the commercial fishing industry.

Commercial fishing permit holders, or the individuals operating and/or managing their vessels, are required to submit trip reports (NOAA Form 88-191, OMB Form No. 0648-0016) setting forth certain information for each trip, which includes the vessel name and number, the vessel operator, and an itemization of the number of fish caught.  This itemization is specific to the type of fish.  Trip reports from South Carolina are mailed to NOAA's Southeast Fisheries Science Center in Key Biscayne, Florida.

When commercial fishing permits are reissued each year, a trip report book is sent to the

permit holder, which contains the blank trip report forms as well as warnings and instructions. The title page of the 2023 Southeast Coastal Fisheries Trip Report book displays the following warning:

> You are advised that disclosure of the information requested in this report is mandatory for the purpose of managing the fisheries in accordance with the fishery conservation and management act of 1976 (16 U.S.C. 1801 et. seq.). Failure to report or filing a false report may result in civil or criminal sanctions. See, e.g, 16 U.S.C. 1857, 1858, 1859; 18 U.S.C. 1001.

During the time period pertinent to the Indictment, the commercial trip limit for Snowy Grouper was 200 pounds[1] and the commercial trip limit for Tilefish[2] was 300 pounds. Put another way, no matter the duration of a boat's trip – one day, four days, or one week – the most Snowy Grouper a vessel could catch per trip was 200 pounds and the most Tilefish a vessel could catch per trip was 300 pounds. The annual catch limits are set by fisheries managers – such as the South Atlantic Fisheries Management Council – who send notices out if/when there is a change in the commercial trip limit for a particular fish.

Federally permitted commercial fish dealers are also required to complete dealer reports itemizing the types and poundage of fish purchased after they are offloaded, or landed, by the fishermen. Dealer reports list the vessel name, captain of the vessel, types and pounds of fish offloaded, and the price for each fish. The hardcopy dealer reports are South Carolina Department of Natural Resource ("SCDNR") forms, and the information is also electronically entered into the Southeast Fisheries Science Center's database.

---

1 All weights are gutted weights.
2 The trip report form refers to this species as "Tilefish, Gray" and the dealer report refers to it as "Blueline Tilefish." The names are synonymous and throughout the trial, and this pre-trial brief, it will be referred to as "Tilefish."

### Don Michel Rynn

The Defendant Don Michael Rynn ("Defendant" and/or "Rynn") managed and/or owned several commercial fishing vessels in the McClellanville, South Carolina, area, which included the Maximum Retriever and Crystal C, along with a third boat, the Seahawk. In March of 2023, the Maximum Retriever and Crystal C were operated out of the Carolina Seafood dock in McClellanville.

### Maximum Retriever and the Crystal C – March 27, 2023

On March 21, 2023, the Maximum Retriever embarked on a commercial fishing trip captained by Defendant's son, Aaron Rynn. The Maximum Retriever returned from this trip on March 27, 2023, and reported the following fish counts on its trip report form dated March 27, 2023[3]:

- 200 pounds Snowy Grouper

- 279 pounds Tilefish

On March 27, 2023, the Crystal C also was unloaded from a commercial trip completed the day before. The Crystal C was captained by Rocky Altman. The Defendant did not submit a trip report for the Crystal C for this trip. However, Carolina Seafood's dealer report for the Crystal C from March 27, 2023, sets forth the following fish counts purchased from the Crystal C:

- 160 pounds Snowy Grouper

- 171 pounds Tilefish

---

[3] The trip report was stamped received on April 19, 2023, which is the date used in the Indictment.

### *South Carolina Department of Natural Resources Tip – March 27, 2023*

On March 27, 2023, the SCDNR received a tip-line report of a commercial fish overage. The individual making the report informed SCDNR that Rynn and the Maximum Retriever had caught an overage of Snowy Grouper, and that the overage was brought to Independent Seafood in Georgetown, South Carolina.

Howell "Cotton" Williams operated Independent Seafood in March 2023. He will testify that on the morning of March 27, 2023, Rynn brought 200 pounds of Snowy Grouper to Independent Seafood. Rynn had transported the fish in the back of his pick-up truck.

### *Carolina Seafood Surveillance Footage[4]*

Surveillance footage obtained during the investigation captured the activity on Carolina Seafood's dock during the early morning hours of March 27, 2023.

Just after midnight, the Maximum Retriever returned. The Defendant was sitting on the dock waiting for the boat to arrive. Once the Maximum Retriever was in place, Aaron Rynn and another deckhand boarded the Crystal C, which was originally located behind the Maximum Retriever, and moved it alongside the Maximum Retriever.

Between 12:30 and 1:00 a.m., deckhands from the Maximum Retriever used hand totes, which are commonly used for carrying fish, to move fish from the ice hold of the Maximum Retriever to the Crystal C. Additional totes were carried off the Maximum Retriever at approximately 1:00 AM toward the parking lot where Rynn's truck was parked.

---

[4] Through the investigation, it was determined that the surveillance camera was 34 minutes ahead of the actual time. The times above are the actual times.

### *Donald Rynn Interview and Statements*

On October 30, 2023, Rynn was interviewed by Special Agents Kevin Mitchell and Michael Lind regarding their investigation into the fish overage. During the interview, the special agents explained what they had uncovered from reviewing the trip reports, dealer reports, Carolina Seafood surveillance footage, and other evidence.

Rynn admitted that fish were transferred from the Maximum Retriever to the Crystal C and his truck. However, he ventured that the Maximum Retriever did not catch the fish. According to Rynn, the fish were originally caught by the Crystal C but had to be transferred to the Maximum Retriever while the vessels were at sea because the Crystal C had diesel fuel in the fish box.

Rynn explained that the transfer observed on the surveillance footage was accurate but that he was moving the fish back to the Crystal C since it had originally caught the fish. He agreed that the Maximum Retriever would have had overages if the fish had not been transferred to the Crystal C. When asked to explain why the fish were taken to his truck, he told the special agents those fish had oil on them, and that he had taken them to a dumpster in Georgetown, South Carolina. When confronted with Howell Williams' statements about 200 pounds of Snowy Grouper being delivered to Independent Seafood, Rynn denied the accusations and maintained he took the fish to a dumpster.

Rynn advised Special Agents Lind and Mitchell that there was a United States Coast Guard ("USCG") report regarding the diesel spill on the Crystal C. Rynn further stated that the USCG got the investigation wrong and listed the source of the spill as the Seahawk, instead of the Crystal C. This is demonstrably false.

Finally, in his interview, Rynn admitted that he was responsible for submitting trip reports for the Crystal C and that he had submitted the trip report for the Maximum Retriever.

*Actual Fish Caught on the Maximum Retriever*

The evidence introduced at trial will show that in the days leading up to March 27, 2023, the Maximum Retriever caught an overage of Snowy Grouper and Tilefish and moved the fish to the Crystal C and to Independent Seafood to conceal the overage.

In total, the Maximum Retriever caught 560 pounds of Snowy Grouper and 450 pounds of Tilefish but used the Crystal C and Independent Seafood, as set forth on the chart below, to hide the overage.

| Fish Type | Maximum Retriever Trip Report | Crystal C Dealer Report | Fish Taken to Independent Seafood |
|---|---|---|---|
| Snowy Grouper | 200 pounds | 160 pounds | 200 pounds |
| Tilefish | 279 pounds | 171 pounds | |

## II.     Nature of the Charges

On August 13, 2024, a grand jury returned a three-count Indictment against the Defendant charging him with two counts of 18 U.S.C. § 1001 (making a false statement) and one count of 18 U.S.C. § 1519 (falsification of records in a federal investigation).

Counts 1 and 3 of the Indictment pertain to the trip report for the Maximum Retriever, which was received by the Southeast National Marine Fisheries Service on or about April 19, 2023. Count 2 of the Indictment pertains to the statements Rynn made to Special Agents Mitchell and Lind on October 30, 2023.

The elements of 18 U.S.C. § 1001(a) are as follows:

1.  The Defendant (1) made a materially false, fictitious, or fraudulent statement or representation; and (2) made or used any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry;

2.  The fact was material to a matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States; and

    3.  The Defendant acted knowingly and willfully.

The elements of 18 U.S.C. § 1519 are as follows:

    1.  The Defendant altered, destroyed, mutilated, concealed, covered up, falsified, or made a false entry in any record, document, or tangible object;

    2.  The Defendant did so with intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States; and

    3.  The Defendant did so knowingly.

## III.   Potential Witnesses

The Government will likely call the following witnesses in its case in chief and may call additional witnesses as required. A witness list is being submitted with this pre-trial brief.

1.  **Joanne Jackson, Carolina Seafood** – Ms. Jackson is the Office Manager of Carolina Seafood and will testify about the process for completing dealer sheets and tally sheets. Moreover, Ms. Jackson can testify about who Carolina Seafood paid for fish coming off the Maximum Retriever and Crystal C, who the captains were for each vessel, and what fish Carolina Seafood purchased from the Maximum Retriever and Crystal C on the morning of March 27, 2023.

2.  **Briana Vaughn, SCDNR Dispatcher** – Briana Vaughn is the SCDNR dispatcher who received the tip from Michael Moore on March 27, 2023. Ms. Vaughn will testify about the receipt of this tip and the actions she took after receiving the tip.

3.  **Michael Moore** – Michael Moore is the individual who called SCDNR on the morning of March 27, 2023, and reported an overage of Snowy Grouper caught by the Maximum Retriever. Michael Moore will testify about his experience when he worked for Don Rynn and what he observed when he called SCDNR on March 27, 2023.

4.  **Aaron Rynn** – Aaron Rynn was the captain of the Maximum Retriever on a commercial trip that began on March 21, 2023, and returned to McClellanville, South Carolina early the morning of March 27, 2023. Aaron will testify about what the Defendant told him prior to the trip about how much fish to catch, what fish the Maximum Retriever caught during the trip, and, finally, about what occurred when the Maximum Retriever returned to the dock the morning of March 27, 2023.

5.    **Travis Pruter** – Travis Pruter was the deckhand on the Maximum Retriever on the commercial trip that began on March 21, 2023, which was captained by Aaron Rynn. Mr. Pruter will testify that he assisted in transferring Snowy Grouper and Tilefish overages from the Maximum Retriever to the Crystal C. Mr. Pruter will further testify that he assisted with carrying Snowy Grouper to the Defendant's truck.

6.    **Rocky Altman** – Mr. Altman was the captain of the Crystal C on the commercial trip that returned to McClellanville the afternoon of March 26, 2023. Mr. Altman will testify about the fish the Crystal C caught during the trip he captained and what fish he observed being offloaded from the Crystal C the morning of March 27, 2023.

7.    **Howell Williams, Independent Seafood** – Mr. Williams will testify about how the Defendant came to Independent Seafood the morning of March 27, 2023, and offered to sell Mr. Williams 200 pounds of Snowy Grouper. Mr. Williams did not purchase the Snowy Grouper, but he allowed it to be stored in his coolers. Mr. Williams will testify about how he instructed an employee to dump the 200 pounds of Snowy Group when investigators began asking about the fish. Mr. Williams initially tried to cover for Defendant when confronted by investigators.

8.    **Nikhil Mehta – NOAA, National Marine Fisheries Service** – Mr. Mehta is a fishery biologist and has been designated by the Government as an expert pursuant to F.RC.P. 16(a)(1)(G). The Government would refer the Court to its filed expert disclosure. ECF No. 37.

9.    **Special Agent Michael Lind, NOAA Fisheries Enforcement** – SA Lind will testify about his involvement in an interview with the Defendant and SA Mitchell on October 30, 2023, and the statements made by the Defendant regarding the events that took place the morning of March 27, 2023.

10.    **Chief Eric Conway, United States Coast Guard** – Chief Conway will testify about the United States Coast Guard's ("USCG") investigation of sheen/spill in Jeremy Creek on or about March 29, 2023, and how this sheen/spill was traced back to the Seahawk, which is a boat owned by the Defendant. Chief Conway will also testify that the USCG did not investigate an oil spill on the Crystal C in March 2023.

11.    **Ray Mroch, Chief of the Commercial Fisheries Monitoring Branch, Beaufort Lab, Southeast Fisheries Science Center** – Mr. Mroch will testify about how the Southeast Fisheries Science Center receives, stores, and enters the data that is contained of commercial trip reports. Further, Mr. Mroch will testify about the importance of accurate reporting on trip report forms. Finally, Mr. Mroch will authenticate several other trip reports received from Rynn by the Southeast Fisheries Science Center for the Maximum Retriever.

12. **Special Agent Kevin Mitchell, NOAA Fisheries Enforcement –** SA Mitchell will testify about the investigation of the Defendant, the interview he participated in with the Defendant on or about October 30, 2023, and, generally, about the enforcement by NOAA of commercial fisherman and dealers.

## IV.    Exhibits

In accordance with Local Rule 26.07, counsel for the Government and the Defendant met on February 12, 2024, to meet, mark, and exchange exhibits.  The Government is providing an exhibit list with this brief and will provide copies of the exhibits to the Court, Clerk, and Court Reporter.

The following Government exhibits have been agreed to by the parties and the Government will seek to admit them at the beginning of trial:

- Government's Exhibit 1
- Government's Exhibit 3
- Government's Exhibit 4
- Government's Exhibit 5
- Government's Exhibit 6
- Government's Exhibit 7
- Government's Exhibit 8
- Government's Exhibit 10

The Government's exhibits that the defense has not agreed to are as follows:

- Exhibits 2A through 2F, which are Maximum Retriever trip reports from trips prior to the March 2023 trip at issue.

- Exhibit 9, which is the United States Coast Guard's Misle Report from March 29, 2023.

- Exhibits 11 and 12, which are the two exhibits that pertaining to the March 27, 2023 SCDNR tip.

  o  Exhibit 11 is the dispatch report, which has been redacted to remove the text in the "comment" section, which contained a summary of what Michael Moore reported.

  o  Exhibit 12 is the audio recording of the call.  The Government understands the Court's ruling pertaining to this call but has kept it on its Exhibit List in the event a situation arises, as set forth in the Court's Order (ECF No. 53) that would warrant its admission.

## V.    Issues That May Arise During Trial – Case Specific

### A.    Statements of the Defendant are Not Hearsay if offered by the Government – Fed. R. Evid. 801(d)(2)(A)

The Government plans to introduce statements made by the Defendant to various individuals on or about March 27, 2023.  Further, the Government will introduce statements the Defendant made to Special Agents Mitchell and Lind on or about October 30, 2023.

All statements the Government offers against the Defendant are non-hearsay by definition and should be admitted as admissions of a party opponent.  *See United States v. Fowler*, 74 Fed. Appx. 262, 264 (4th Cir. 2003) (citing Fed. R. Evid. 801(d)(2)(A)) ("[W]e find that Fowler's statements on the tape were an admission by a party-opponent.  They were offered against Fowler and were his own statements.").  Rule 801(d)(2)(A) renders a statement non-hearsay if it was made by the party against whom it is offered — "the statements need neither be incriminating, inculpatory, against interest, nor otherwise inherently damaging to the declarant's case." *United States v. Reed*, 227 F.3d 763, 770 (7th Cir. 2000).  Rule 801(d)(2)(A) admits all statements made by one party and offered as evidence by the opposing party without further qualification.  *Id.* Therefore, out-of-court statements made by the Defendants are admissible under Fed. R. Evid. 801(d)(2)(A).

### B.    United States Coast Guard Report dated March 29, 2023

The Government seeks to introduce a USCG report dated March 29, 2023 (hereinafter "USCG Report"), which pertains to an investigation about a regular occurrence of oil sheen observed on Jeremy Creek around the Carolina Seafood dock.[5]  It was believed that the oil sheen was caused by bilge slops discharge coming from one of the vessels docked at Carolina Seafood's

---

[5] This is marked as Exhibit 9 on the Government's Exhibit list.

dock.

Pursuant to Federal Rule of Evidence 402, relevant evidence is admissible unless "the United States Constitution; a federal statute; these rules; or other rules prescribed by the Supreme Court" provide otherwise. *See* Fed. R. Evid. 402. Rule 401 of the Federal Rules of Evidence defines relevant evidence as evidence that "(a). . . has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Here, the USCG Report is of consequence and has a tendency to make it more probable that Rynn made materially false statements to federal law enforcement agents on or about October 30, 2023. As set forth earlier in this brief, on October 30, 2023, Rynn told Special Agents Mitchell and Lind that the reason fish were being moved from the Maximum Retriever to the Crystal C was because the Crystal C had a diesel spill in its fish box. Rynn further informed the agents that the USCG wrote a report on the spill but got the vessel wrong in the report. It was Rynn's position that the USCG report listed the Seahawk as the source of the spill, not the Crystal C.

Once the USCG Report is admitted, it will demonstrate that Rynn was present on the Seahawk on March 29, 2023, when the USCG was investigating the source of the oil sheen. The USCG Report will also show Rynn's knowledge that the USCG investigation pertained to oil coming from the engine box, and, finally, that the USCG concluded it was the Seahawk's engine box creating bilge slop to discharge, which caused the sheen.

USCG Chief Eric Conway will also testify that there was no other USCG report and/or investigation from March 27, 2023, to March 29, 2023, pertaining to either the Seahawk or Crystal C. This is all relevant under Rule 401 because it establishes that Rynn's statements to law enforcement on or about October 30, 2023, were materially false and, as a result, the USCG Report

should be admitted.

Moreover, there is no other rule or statute that would prevent the USCG Report's admissibility. *See* F.R.E. 402. The only possible rule that could lead to the exclusion of the USCG Report is Federal Rule of Evidence 403, which states:

> The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.

Fed. R. Evid. 403. Here, since the Defendant's own statements on or about October 30, 2023, reference the USCG and, more specifically, a report, there is no risk that the report will prejudice the Defendant, confuse the issues and/or mislead the jury. In fact, the report is necessary to disprove Defendant's lie.

### C.     Government's Notice of Intent to Use Evidence Intrinsic to the Crimes and/or Pursuant to Rule 404(b)

The Government has filed a notice pursuant to Federal Rule of Evidence 404(b) of its intent to use evidence that it believes is intrinsic to the crimes charged in the Indictment, but, in the alternative, should be admitted pursuant to Rule 404(b). *See* ECF No. 50.

### D.     Investigative techniques and quality

The quality of the Government's investigation is not an issue in the trial as the only question for the jury is whether the evidence proves the Defendant committed the crime charged beyond a reasonable doubt. *See United States v. Mason*, 954 F.2d 219, 222 (4th Cir. 1992); *see also United States v. Temple*, 122 F.3d 1064 (4th Cir. 1997) (unpublished) (relying upon *Mason* to affirm instruction that "law enforcement techniques are not your (the jury's) concern").[6] For this reason,

---

[6] A variety of cases have affirmed this basic principle that the jury is concerned with the evidence, or lack thereof, and not law enforcement's actions. *See, e.g.*, *United States v. Brown*, 474 F. App'x 954, 946 (4th Cir. 2012) (unpublished); *United States v. Walker*, 66 F.3d 318 (4th Cir. 1995)

attacks on the Government's investigation are irrelevant and should generally be inadmissible. *See United States v. McVeigh*, 153 F.3d 1166, 1192 (10th Cir. 1998) ("Under our system of criminal justice, the issue submitted to the jury is whether the accused is guilty or not guilty. The jury is not asked to render judgment about non-parties, nor is it normally asked to render a verdict on the government's investigation."); *see also United States v. Patrick*, 248 F.3d 11 (1st Cir. 2001); *United States v. Veal*, 23 F.3d 985, 989 (6th Cir. 1994). A proposed jury charge regarding this issue will be submitted by the Government.

## VI. Issues That May Arise During Trial – General Matters

### A. Summary Exhibits

The United States intends to introduce at least one "summary" document pertaining to the number of fish that were offloaded on or about May 27, 2023. The use of "summary charts" is approved, and encouraged, especially when there are numerous documents or other items being summarized. *See, e.g., United States v. Loayza*, 107 F.3d 257, 264 (4th Cir. 1997). "Summary charts are admissible if they aid the jury in ascertaining the truth. The complexity and length of the case as well as the numbers of witnesses and exhibits are considered in making that determination." *Id.* (citation omitted). Such charts and summaries are themselves the evidence under either Rule 611(a) or Rule 1006, so long as they will help the jury to better understand the evidence presented and to ascertain the truth. *See, e.g., United States v. Johnson*, 54 F.3d 1150, 1162 (4th Cir. 1995); *United States v. Hayes*, 322 F.3d 792, 799 (4th Cir. 2003) (upholding admission of summary charts); *United States v. Porter*, 821 F.2d 968, 975 (4th Cir. 1987); *United*

---

(unpublished); *United States v. Borda*, 178 F.3d 1286 (4th Cir. 1999) (unpublished) (affirming exclusion of defense expert witness on investigative techniques because it was "not relevant and would not assist the jury in determining any fact in issue" (citing *Mason v. United States*, 719 F.2d 1485, 1490 (10th Cir. 1983) (no abuse of discretion to exclude expert testimony of private detective offered by defendant to show inadequacy of police investigative techniques))).

*States v. Keltner*, 675 F.2d 602, 605–06 (4th Cir. 1982). After admission, the charts and summaries may be used by the jury during its deliberation like any other piece of evidence.

The Government's proposed summary exhibit is admissible under both Rule 1006 and Rule 611(a). A Rule 1006 "summary, chart, or calculation" is admissible where the "contents of voluminous writings, recordings, or photographs . . . which cannot conveniently be examined in court." Fed. R. Evid. 1006; *see generally United States v. Janati*, 374 F.3d 263, 272 (4th Cir. 2004). While the evidence underlying such summaries must be admissible, it need not be admitted. *Id.* at 272–73. Summaries or charts that are based on the substantial audio, video, and photograph evidence provided in discovery in this case should be admitted pursuant to Rule 1006.

Independently, Rule 611(a) permits the introduction of charts that do not strictly comply with Rule 1006. In *Johnson*, the Fourth Circuit explained the contours of Rule 611(a) in admitting a summary organization chart based on trial testimony. 54 F.3d at 1162. *Johnson* explained that summaries were admissible even where an offered summary did not fall within Rule 1006 because testimony, and not voluminous documents or recordings, was summarized on the chart. *Johnson* then explained that Rule 611(a) permits the Court the discretion to admit as evidence charts that would be helpful to the jury in understanding the evidence. To protect against any prejudice, the Court suggested that the preparer of the chart be subject to cross-examination and that the trial court advise the jury that they are to determine whether the summary chart accurately reflected the evidence presented.

To be admissible under Rule 611(a) the chart need only "help the jury to better understand the evidence presented and to ascertain the truth." *United States v. Pena*, 213 F.3d 634, 2000 WL 541087 (4th Cir. 2000) ("It is well-established that a district court may admit summary testimony and summary charts, under Rule 611(a) of the Federal Rules of Evidence, if they will help the jury

14

to better understand the evidence presented and to ascertain the truth."); *see United States v. Levy*, 2009 WL 1863687 (4th Cir. 2009) (applying same standard and finding no error in admission of summary charts in mail and wire fraud case); *Pena*, 2000 WL 541087, at *3-4 (same).[7]

### B.     Defense Counsel Should Not Be Permitted to Define Reasonable Doubt

Counsel should not be permitted to attempt to define – expressly or by way of analogy or example – reasonable doubt for the jury. *See United States v. Reives*, 15 F.3d 42, 45, 46 (4th Cir. 1994) (noting the Fourth Circuit has "consistently and vigorously condemned the attempts of trial courts to define reasonable doubt" on the basis that trying to define the term will just "confuse matters"); *see also United States v. Gorham Bey*, 373 F. App'x 394, 401 (4th Cir. 2010) (unpublished). Despite this clear prohibition, a number of defense counsels in recent trials have improperly attempted to define or expound upon the meaning of reasonable doubt during argument – whether in opening or closing.[8] Such attempts to define reasonable doubt by trial counsel should

---

[7] Although the chart or summary must accurately and fairly reflect the contents of the documents and testimony being summarized, there is no requirement that a chart include the opponent's version of the evidence or his theory of the case. *United States v. Ambrosiani*, 610 F.2d 65, 68 n.2 (1st Cir. 1979); *Myers v. United States*, 356 F.2d 469, 470 (5th Cir. 1966). The headings and captions on the summary chart may be grounded on assumptions about the underlying evidence, so long as the chart, and the assumptions in it, remain a summary of evidence. *United States v. Diez*, 515 F.2d 892, 905 (5th Cir. 1975). In light of this rule, the proponent of the chart has wide latitude in constructing her charts. *United States v. Lacob*, 416 F.2d 756, 762 (7th Cir. 1969)(chart upheld which used caption or heading "Total Net Unreported Income"); *Diez*, 515 F.2d at 905 (chart upheld which used caption or heading "Schedule of Sales, Net Taxable Gains to Peter A. Palori and Amounts Not Reported or Taxable Gain Reported by Others"); *United States v. Smyth*, 556 F.2d 1179, 1182–84 (5th Cir. 1977) (chart upheld which used caption or heading "falsified data" and "difference between original/false").

[8] As examples, several defense attorneys have used a chart comparing "reasonable doubt" to other possible standards to suggest its meaning by comparison. Another defense attorney attempted to analogize reasonable doubt to a football field by requiring proof that not just crosses mid-field but reaches the end zone (an apparent attempt to distinguish between a preponderance of the evidence (beyond the fifty-yard line or more than 50%) and to suggest that all 100 yards (or 100% certainty) is required. Such charts or analogies are impermissible under Fourth Circuit law and should be precluded.

be prohibited. *See United States v. Patterson*, 150 F.3d 382, 389 (4th Cir. 1998) ("The law is well-settled in this Circuit that a judge is not allowed to define reasonable doubt unless requested to do so by the jury. Furthermore, a district court may restrict counsel from arguing definitions of reasonable doubt [in closing argument].") (internal citation omitted); *United States v. Headspeth*, 852 F.2d 753, 756 (4th Cir. 1988) (argument "that the district court erred in refusing to allow [defense] counsel to define the term reasonable doubt in closing argument" was "flatly refuted" by Circuit precedent); *United States v. Crockett*, 813 F.2d 1310, 1317 (4th Cir. 1987) ("trial court's refusal to permit elaboration of the standard in closing argument" was part of its power to "limit closing argument to 'ensure that argument does not . . . impede the fair and orderly conduct of the trial'" (quoting *Herring v. New York*, 422 U.S. 853, 862 (1975))).

**C.     Jury Nullification Arguments Should be Precluded[9]**

This Court should exclude argument suggesting jury nullification from the trial. *See United States v. Muse*, 83 F.3d 672, 677 (4th Cir. 1996) (explaining that trial court should prevent defense counsel from presenting nullification arguments to the jury); *United States v. Young*, 20 F.3d 758, 765 (7th Cir. 1994) (affirming trial court's granting of government's motion in limine to exclude jury nullification arguments); *see also United States v. Young*, 470 U.S. 1, 7–10 (1985) (holding that court has duty to prevent counsel from making improper arguments to the jury, including those that are designed to divert the jury from its duty to decide the case on the facts and the law).[10]

---

[9] While the Government believes that counsel for the Defendants are fully aware of the settled law on jury nullification, out of an abundance of caution, the Government raises this issue. Additionally, a defendant can place defense counsel in a difficult position, when wanting to put forward legally precluded defenses and arguments. It is the Government's intention that raising such issues at this time will allow the Court to address such issues and make a clean trial record.

[10] *See also United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) (a trial judge "may block defense attorneys' attempts to serenade the jury with a siren song of nullification"); *United States v. Avery*, 717 F.2d 1020, 1027 (6th Cir. 1983) (affirming district court's refusal to encourage jury to consider anything other than the facts and law); *United States v. Burkhardt*, 501 F.2d 993, 996–97 (6th Cir. 1974) (holding that court should instruct the jury to ignore everything but the

Accordingly, defense counsel should be prohibited from arguing jury nullification in an attempt to confuse the jury with appeals based on emotion, sympathy, or other similar consideration.

### D.     The Defendant's Character

#### i.    Evidence of Specific Good Acts and Non-Corrupt Conduct by the Defendant Should be Precluded

A defendant should be precluded from offering evidence of the defendant's lawfulness and/or non-corrupt conduct, except for reputation or opinion evidence offered by character witnesses strictly in accord with the limitations of Fed. R. Evid. 405(a).[11] Moreover, the Government requests that the Court preclude counsel from making such arguments in opening or closing statements.

In an effort to distract the jury from the charges for which the Defendant is standing trial, the Defendant may seek to elicit from Government witnesses, or present through their own witnesses, testimony that on prior occasions the defendant was lawfully involved in or committed good acts.[12]

---

facts and the law); *United States v. Sepulveda*, 15 F.3d 1161, 1190 (1st Cir. 1993) ("[N]either the court nor counsel should encourage jurors to exercise [nullification] power. A trial judge, therefore, may block defense attorneys' attempts to serenade a jury with the siren song of nullification.") (citations omitted); *United States v. Trujillo*, 714 F.2d 102, 105 (11th Cir. 1983) (holding that a district court has a duty to try to ensure that the jury reaches a verdict based upon the evidence and the law).

[11] Even evidence offered under Rule 405(a), of course, cannot include specific instances of good conduct: it is limited to a description of the subject's reputation or to a brief statement of opinion, without support from specific instances of conduct. *See* Advisory Committee Notes to Rule 405 (The rule "contemplates that testimony of specific instances is not generally permissible on direct examination of an ordinary opinion witness to character . . . . [O]pinion testimony on direct in these situations ought in general to correspond to reputation testimony as now given *i.e.* be confined to the nature and extent of observation and acquaintance upon which the opinion is based").

[12] Such evidence is sometimes affirmatively offered, but often takes the form of questions posed during cross-examination, such as: (a) "Isn't it true the defendant did not do anything improper on this occasion?"; (b) "Isn't it true that defendant always treated you with respect?"; (c) "Isn't it true that defendant was a nice person?"; (d) "Isn't it true that defendant always followed through on

Any evidence or argument of this sort is inadmissible, and the Court should exclude it. The law is clear: "A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990) (excluding taped proof that defendants met regularly and did not discuss criminal activity); *see also United States v. Gravely*, 840 F.2d 1156, 1164 (4th Cir. 1988) (evidence of specific good acts is not admissible [under] Fed. R. Evid. 405"); *United States v. Heideke*, 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment."); *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) (where private investigator on trial for extorting clients argued that he intended to report clients to FBI, court sustained decision excluding evidence that, in earlier years, he provided information to FBI, stating "[e]vidence that the defendant frequently performs lawful or laudable acts does not often establish that some subsequent act is also lawful or laudable"). Evidence of other lawful behavior is irrelevant because acts of honesty or good deeds do not prove an absence of dishonest acts. *See, e.g.*, *United States v. Grimm*, 568 F.2d 1136, 1138 (5th Cir. 1978) ("Evidence of noncriminal conduct to negate the inference of criminal conduct is generally irrelevant."); *United States v. D'Arco*, 1991 WL 264504, at *1 (N.D. Ill. 1991) (where Government contended that defendant legislator would attempt to focus on occasions where he performed his job lawfully in order to distract jury from charges in indictment, court granted Government's motion in limine, ruling that "[e]vidence that defendant acted lawfully on other occasions is inadmissible to prove that he acted lawfully on the occasions alleged in the

---

her promises?"; (e) "Isn't it true defendant sought to help you on other occasions (not relevant to the charged case)?"; and (f) "Isn't it true defendant helps others whenever she can?"

indictment"); *see also United States v. Whitfield*, 590 F.3d 325, 361 (5th Cir. 2009) ("Evidence of non-criminal conduct to negate the inference of criminal conduct is generally irrelevant.").

Every criminal may, of course, have intervals in life in which he chooses a lawful path. Criminal trials are not about the restraint or even good judgment the defendant may have shown in uncharged instances. *See United States v. Marrero*, 904 F.2d 251, 260 (5th Cir. 1990) ("The fact that [the defendant] did not overcharge in every instance in which she had an opportunity to do so is not relevant to whether she, in fact, overcharged as alleged in the indictment."). Rather, criminal trials are about whether the defendant engaged in the criminal conduct for which he is charged. *See also United States v. Hill*, 40 F.3d 164, 168-69 (7th Cir. 1994) (holding that the fact that the defendant did not steal three "test letters" from the mail on other occasions was not admissible to prove or disprove his intent with regard to the stolen letters); *United States v. Camejo*, 929 F.2d 610, 613 (11th Cir. 1991) (drug defendant properly precluded from introducing evidence that he refused an opportunity to become involved in a different narcotics business); *United States v. Beverly*, 913 F.2d 337, 353 (7th Cir. 1990) ("[The defendant] undoubtedly could have called any number of additional witnesses to testify that they never had purchased cocaine from him. Such proof of an assertion by a negative is inadmissible."). Accordingly, evidence or argument about lawful or good conduct is improper in the context of this trial and should be precluded.

### ii.     Government Impeachment of Defense Character Witnesses

Should the Defendant attempt to call a character witness, the Government is entitled to broad cross-examination of those witnesses. As the Supreme Court has long held, the scope of the defendant's permissible character evidence is limited:

> When the defendant elects to initiate a character inquiry, . . . [t]he witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental and moral traits; nor can he testify that his own acquaintance, observation, and knowledge of defendant leads to his own independent opinion that defendant possesses a

> good general or specific character, inconsistent with commission of acts charged.

*Michelson v. United States*, 335 U.S. 469, 478 (1948). However, should a defendant call character witnesses, cross-examination is broad, including "relevant specific instances of conduct." *See* Fed. R. Evid. 405(a). As the Supreme Court in *Michelson* explained:

> The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him . . . . Another hazard is that his own witness is subject to cross-examination as to the contents and extent of the hearsay on which he bases his conclusions, and he may be required to disclose rumors and reports that are current even if they do not affect his conclusion. It may test the sufficiency of his knowledge by asking what stories were circulating concerning events, such as one's arrest, about which people normally comment and speculate. Thus, while the law gives the defendant the option to show as a fact that his reputation reflects a life and habit incompatible with commission of the offense charged, it subjects his proof to tests of credibility designed to prevent him from profiting by a mere parade of partisans.

*Michelson*, 335 U.S. at 479. *See Mannix v. United States*, 140 F.2d 250, 251–52 (4th Cir. 1944) (addressing the appropriate scope of cross examination of character witnesses; prosecutor "had a right to ask certain questions as to particular facts that may have affected the defendant's reputation if these facts had come to the knowledge of the witness . . . . [as] 'a witness to good character may be asked, on cross-examination, whether he has heard particular and specific charges, or rumors, against an accused, of acts inconsistent with the trait of character about which the witness has testified'"). [13]

---

[13] The Government, however, acknowledges that the specific acts of conduct which character witnesses are questioned about on cross-examination cannot be proven by extrinsic evidence unless it is an essential element of the charge. *See* Fed. R. Evid. 405(b); *United States v. Benedetto*, 571 F.2d 1246, 1250 (2d Cir. 1978) ("while a character witness may be asked on cross-examination about 'specific instances of conduct,' such acts may not be proved by extrinsic evidence").

## VII.     Outstanding Motions

The Government has no outstanding motions at this time but has filed a notice of intent to use evidence, which was objected to by the Defendant. *See* ECF Nos. 50, 54. The Court has issued rulings on the Defendant's motion to dismiss and motion in limine, which were the two pending motions.

## VIII.    Time Required

The Government believes that it will rest its case-in-chief within two days.

Respectfully submitted,

BROOK B. ANDREWS
ACTING UNITED STATES ATTORNEY

By:     */s Amy Bower*

Winston D. Holliday, Jr. (#07597)
Assistant U.S. Attorney
1441 Main Street, Suite 500
Columbia, South Carolina 29201
(803) 929-3079

Amy F. Bower (#11784)
Assistant U.S. Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
(843) 727-4381

March 10, 2025