IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | |
|---|---|
| United States of America )<br>    )<br>v.    )<br>    )<br>Don Michael Rynn )<br>    ) | **Case No. 2:24-cr-00653-RMG** |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its undersigned Assistant United States Attorneys, submits this memorandum in advance of Don Rynn's sentencing and recommends that this Court impose on Rynn a sentence of **fifteen months**. The Government's request is based primarily on the need (1) to promote respect for the law, (2) to afford adequate deterrence to this type of criminal conduct, both general and specific, and (3) to reflect Rynn's efforts to obstruct justice.

I.  **BACKGROUND**

On August 13, 2024, a grand jury returned a three-count Indictment against the Defendant, charging him with two counts of Title 18, United States Code, Section 1001 (Making a False Statement), and one count of Title 18, United States Code, Section 1519 (Falsification of Records in a Federal Investigation). Rynn was convicted of all three counts on March 20, 2025.

II.  **FACTS**

   i.   NOAA and the commercial fishing industry.

The federal commercial fishing industry is regulated by the National Oceanic and Atmospheric Administration ("NOAA"), which is an Executive Branch of the United States Government. NOAA's National Marine Fisheries Service ("NMFS") assists with the enforcement

1

and regulation of the commercial fishing industry. This is a heavily regulated area, and it is based on the Fishery Conservation and Management Act of 1976, also known as the Magnuson-Stevens Act, which was one of a host of laws passed in the seventies to address the country's degrading environmental condition.

Commercial fishing permit holders, or the individuals operating or managing their vessels, are required to submit trip reports (NOAA Form 88-191, OMB Form No. 0648-0016) after each fishing voyage. These trip reports include the vessel name and number, the vessel operator, and an itemization of the number of fish caught. This itemization is specific to the type of fish. Trip reports from South Carolina are mailed to NOAA's Southeast Fisheries Science Center in Key Biscayne, Florida, and are used to manage fish populations to ensure they are not depleted by overfishing. This is a macro function, and successful population management depends on the accuracy of the cumulative reports. Inaccurate reports distort NOAA's impression of the various fish populations and can lead to the depletion of species as well as the closing of fisheries at less-than-optimal times.

When commercial fishing permits are reissued each year, a trip report book is sent to the permit holder which contains the blank trip report forms as well as warnings and instructions. The title page of the 2023 Southeast Coastal Fisheries Trip Report book displays the following warning:

> You are advised that disclosure of the information requested in this report is mandatory for the purpose of managing the fisheries in accordance with the Fishery Conservation and Management Act of 1976 (16 U.S.C. 1801 et. seq.). Failure to report or filing a false report may result in civil or criminal sanctions. See, e.g., 16 U.S.C. 1857, 1858, 1859; 18 U.S.C. 1001.

As mentioned repeatedly during trial, page 5 of the book contains the following admonition:

> The NMFS requires this information for the conservation and management of marine fisheries resources. These data will be used to monitor quotas in this fishery. Data about prices, trip expenses and labor payments will be used to evaluate the economic effects of proposed regulations in the fishery.

During the time period of the Indictment, the commercial trip limit for Snowy Grouper was 200 pounds and the commercial trip limit for Tilefish was 300 pounds.[1] Put another way, no matter the duration of a boat's trip – one day, four days, or one week – the maximum number of Snowy Grouper a vessel could land[2] per trip was 200 pounds and the most Tilefish a vessel could land per trip was 300 pounds. The South Atlantic Fisheries Management Council sets the trip limit for commercial fisherman and sends out notices if there is a change in this limit for a particular fish. The limit would change, for instance, as the collective catch for a species approaches the quota for the year. This change would be negatively impacted by the submission of false reports.

Federally permitted commercial fish dealers are also required to complete dealer reports itemizing the types and poundage of fish purchased after they are landed. Dealer reports list the vessel name, captain of the vessel, types and pounds of fish offloaded, and the price for each fish. The hardcopy dealer reports are South Carolina Department of Natural Resource ("SCDNR") forms, and the information is electronically entered into the Southeast Fisheries Science Center's database.

    ii.    <u>The March 27, 2023 events and the associated trip report.</u>

Rynn managed or controlled several commercial fishing vessels in the McClellanville, South Carolina, area, which included the Maximum Retriever and Crystal C, along with a third

---

[1] The weights given are for gutted fish.
[2] "Land" is a term of art and means "to begin offloading fish, to offload fish, or to arrive in port or at a dock, berth, beach, seawall, or ramp." 50 C.F.R. § 600.10. Practically speaking, fishing vessels sometimes catch more than the prescribed limit. These fish should be released back into the ocean before the vessel returns, and if so, are not counted against the weight limit.

3

boat, the Seahawk. In March 2023, the Maximum Retriever and Crystal C operated out of the Carolina Seafood dock in McClellanville. Carolina Seafood was a federally permitted commercial fish dealer.

On March 21, 2023, the Maximum Retriever embarked on a commercial fishing trip captained by Don Rynn's son, Aaron Rynn ("Aaron"). As Aaron testified to at trial, he was told by his father to catch as many fish as he could, and they would take care of it when he got back. The Maximum Retriever returned to the Carolina Seafood dock early the morning of March 27, 2023.

Surveillance footage obtained from Carolina Seafood captured the activity on Carolina Seafood's dock. Soon after midnight, the Maximum Retriever arrived. Rynn was sitting on the dock waiting for the boat to arrive. Once the Maximum Retriever was in place, Aaron moved the Crystal C, which was originally located behind the Maximum Retriever, so that the two boats were side by side.

Shortly afterwards, and under the direction of Rynn, the deckhands moved fish from the Maximum Retriever to the Crystal C. Additional fish were carried from the Maximum Retriever to Rynn's truck, in which they were transported to Independent Seafood.

Rynn reported the following false fish counts on the Maximum Retriever trip report dated March 27, 2023[3]:

- 200 pounds Snowy Grouper
- 279 pounds Tilefish

The Crystal C had returned the afternoon of March 26th and had not unloaded its fish. The captain, Rocky Altman, had to wait until the following morning, when a Carolina Seafood

---

[3] The trip report was stamped received on April 19, 2023, which is the date used in the Indictment.

employee would be present to tally the fish. Notably, the Crystal C had used a different type of fishing technique not designed to catch Snowy Grouper or Tilefish. When Altman arrived at Carolina Seafood the next morning and saw fish he did not catch being offloaded from his boat, he left immediately. He has not worked for Rynn since, and he did not get paid by Rynn for the trip.

Rynn did not submit a trip report for the Crystal C,[4] despite having done so multiple times in the past. However, Carolina Seafood's dealer report from March 27, 2023, sets forth the following inaccurate fish count[5] for that boat:

- 160 pounds Snowy Grouper
- 171 pounds Tilefish

On March 27, 2023, SCDNR received a phoned-in tip of a suspected commercial fish overage. This caused state and federal agents to deploy to Carolina Seafood as well as to Independent Seafood[6] in Georgetown, South Carolina.

At the time, Howell "Cotton" Williams ("Williams") operated Independent Seafood. On the morning of March 27, 2023, Rynn brought 200 pounds of Snowy Grouper – all part of the illegal overage – to Independent Seafood. These fish were transported in the back of his truck and stowed at Independent Seafood to disguise their source. After law enforcement approached Williams about the Snowy Grouper, Williams disposed of them in the river near his shop. Initially, Williams had lied to cover for Rynn, but he ultimately told law enforcement the truth, which was that Rynn had brought Snowy Grouper to Independent Seafood that morning, and that Williams

---

[4] The Government is prepared to submit multiple trip reports for the Crystal C signed by Don Rynn, if necessary.
[5] Evidence presented at trial demonstrated these fish were caught by the Maximum Retriever, not the Crystal C, and had been transferred to avoid reporting requirements.
[6] Independent Seafood was not a federally permitted commercial fish dealer.

had gotten rid of the fish after being contacted by law enforcement.

In total, the Maximum Retriever caught 560 pounds of Snowy Grouper and 450 pounds of Tilefish but used the Crystal C and Independent Seafood, as described above, to hide the overage. Furthermore, he lied on the subsequent trip report for the Maximum Retriever, deceiving NOAA and the NMFS by feeding them faulty data, impeding the proper administration of the Snowy Grouper and Tilefish fisheries.

    iii.    <u>Trial Testimony of Ray Mroch, Nikhil Mehta, and Joanne Jackson</u>.

At trial, the Government called two witnesses whose testimony focused on the commercial fishing industry, the regulations surrounding it, and the importance of the regulations to the management of the fisheries and the conservation of certain species of fish.

Ray Mroch[7] is the Branch Chief for the Southeast Fisheries Science Center, which is a division of NOAA, and Nikhil Mehta[8] is a sustainable fisheries biologist employed by NOAA and the United States Department of Commerce. Between them, the two gave details of how the federal fisheries for Snowy Grouper and Tilefish (among other populations) are managed, to include the regular submission of trip and dealer reports, the collation of those reports into spreadsheets and summaries, the sharing and analysis of those summaries by fishery biologists, and the adjustment of per trip limits based on what is reported. The goal is to sustain the species while ensuring that the fishing fleet remains viable – a balancing of conservation and commerce on a regional scale. In another context, such conscious management could be described as effective stewardship. This stewardship is entirely the goal of the administrative process discussed repeatedly and at length during the trial, centering on the trip report requirement established by the Magnuson-Stevens

---

[7] Mroh's testimony can be found in the draft trial transcript at pp. 253-72.
[8] Mehta's testimony can be found in the draft trial transcript at pp. 273-89.

6

Fishery Conservation and Management Act of 1976.

Mehta went on to describe the conservation aspects specific to the Snowy Grouper. The Snowy Grouper is subject to a rehabilitation plan through 2034. Snowy Grouper's are particularly susceptible to overfishing because individual fish change their sex at around the five-to-seven-year point. If they are depleted at either end, their breeding is impaired. Also, if the season is shut sooner than expected, and those fish that co-exist in the Snowy Grouper's habitat are still available, the Snowy Grouper suffers collateral damage as it is caught and then released. Because they are deepwater fish, being brought to the surface is almost always fatal.

In addition to Mroch and Mehta, the Government called Joanne Jackson[9] of Carolina Seafood who also provided testimony on the "proper administration" of the commercial fishing industry. Jackson discussed her obligations to file dealer reports, the time constraints on those reports, and the consequences of filing inaccurate or untimely reports.

### III.    OBSTRUCTION

In addition to the above-described factual framework, Rynn has obstructed justice on multiple occasions. The PSR captures two incidents in which, first, Rynn instructed his son Aaron[10] not to talk to investigators, and second, to tell investigators that he "was so f*cked up on drugs that I [didn't] recall what happened."[11] Aaron Rynn testified that he was not so impaired that he could not remember what happened, and that this would have been a lie.

Rynn also testified at trial and lied on the stand. The Government has identified the following falsehoods in his testimony, referred to by page and line number in the trial transcript.

**TT 375:5-13**: Rynn indicates the fish were removed from the Crystal C because they had been "scaled off from sloshing around" and that the ice had "wash[ed]…out from under the fish." This

---

[9] Jackson's testimony can be found in the draft trial transcript at pp. 71-92.
[10] See PSR, ¶ 15.
[11] See PSR, ¶ 16.

is false. The fish were removed from the Crystal C to transport to Independent Seafood in good condition. They were part of the Maximum Retriever overage.

**TT 385:9-16**: Rynn indicated Aaron needed representation to meet with the agents, and that is why he interfered with the interview, when his concern was preventing Aaron from discussing Rynn's involvement in the cover-up.

**TT 386:4-15**: Rynn indicated Rocky Altman abandoned the Crystal C, when in fact Altman returned the next morning for the offload and left when he saw fish coming off his boat he had not caught. See also TT 187:12 – 188:17.

**TT 387:1-4**: Rynn reiterated that Altman abandoned the boat.

**TT 394:12-17**: Rynn indicated he went by the Carolina Seafood paperwork to determine the weight of the fish caught by the Maximum Retriever, when that paperwork would have been incorrect based on the transfer of fish Rynn directed the night before.

**TT 400:20-22**: Rynn denied orchestrating the movement of fish from the Maximum Retriever to the Crystal C and his truck.

**TT 402:15-17**: Rynn testified, "What took place on those boats was not delegated by me," which is false.

**TT 403:2-8**: Rynn testified the fish on the Crystal C had been contaminated by fuel, which is false.

**TT 415:19-21**: Rynn denied that diesel fuel from the Seahawk went into Jeremy Creek when he cranked the Seahawk, which is false. See also TT 241:7 – 242:16.

**TT 416:8-15**: Rynn testified the United States Coast Guard photograph of the Seahawk was "false."

**TT 418:2-11**: Rynn testified Altman never returned to the Crystal C, when Altman testified as to his actions as well as his observation that fish were taken off the Crystal C that he did not catch. This observation was factually true.

**TT 421:14-23**: Rynn denied knowing that fish were moved to the Crystal C and characterized the fish moved to his truck as "NFG, non-functional goods."

**TT 422:18-22**: Rynn again testified the fish were contaminated, and that he was going to see what he could do with them or throw them away, when in fact he traveled to Independent Seafood for them to be iced down in anticipation of resale. See also TT 213:25 – 214:13.

**TT 423:6-9**: Rynn testified the fish that came off the Crystal C were "f'ed up" and further instructed that they be thrown in the back of his truck.

8

**TT 423:15-20**: Rynn testified Williams has a history of taking trash fish and putting them on the market, that these fish were contaminated with diesel, and that if he could not use them, he should throw them in the dumpster. The fish were not contaminated, and they were iced down for Rynn. Williams was not a federally licensed dealer and could not sell the fish.

In summary, Rynn lied repeatedly about his involvement to deflect his knowledge of the criminal endeavor. These lies were material to his guilt or innocence.

IV.  **18 U.S.C § 3553(a) SENTENCING FACTORS WARRANT A SENTENCE WITHIN THE GUIDELINES RANGE**

The USPO properly calculated the guideline range of fifteen to twenty-one months. The Government believes a sentence of **fifteen months** is an adequate sentence considering the sentencing factors.

The sentencing statute, 18 U.S.C. § 3553(a), requires the Court to impose a sentence that is "sufficient, but not greater than necessary," to comply with the purposes of sentencing.[12] According to the revised sentencing scheme promulgated by and in the wake of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the district court must first calculate the advisory Guidelines range and then consider the factors set forth in §3553(a). The Government will discuss the most relevant factors below.

    a.   <u>The nature and circumstances of the offense and the history and characteristics of the defendant.</u>

Rynn deliberately circumvented the reporting requirements of the Magnuson-Stevens Act by falsifying the Maximum Retriever trip report. Trip reports are used to manage federally monitored fisheries, and those fisheries face the threats of over-fishing and depletion. Ignoring the

---

[12] Those purposes are the need for the sentence "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." § 3553(a)(2)(A)-(D).

9

policy goals in place, Rynn instructed his son to catch as many Snowy Grouper and Tilefish as he could, and that they would take care of the overage when he returned, which is how events transpired. Rynn was on the dock the night the Maximum Retriever returned and oversaw the illicit movement of fish in order to deceive Carolina Seafood into thinking two vessels had operated within legal limits, when in fact one vessel had vastly over-fished.

Rynn's lack of remorse is disappointing. He continuously deflected blame onto others from the witness stand, repeating the canard that the fish from the Crystal C were contaminated when they were not. He also denied knowing about and orchestrating the movement of the fish, when the surveillance video from that evening showed him ideally situated at the stern of the Maximum Retriever, directing the actions of crew members he viewed with contempt, referring to them as "meth heads" who "would wear a bikini in January." 409: 3.

    b.    <u>The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.</u>

The relevant regulatory regime is an interconnected process that requires truthful reporting from commercial boats and seafood dealers. The United States uses the information it receives to manage fragile fish populations. Rynn ignored the regulations and focused on his personal benefit. Surely, others who share Rynn's mindset view this as a process crime, if a crime at all. Apparently, Rynn viewed circumventing his reporting requirements as a matter of little consequence. To dissuade him of this attitude, a custodial sentence is necessary.

Anecdotally, the commercial fishing industry is one that employs anyone willing to put up with the conditions and the pay. A felony standing alone will have little bearing on Rynn's ability to find work, and the lack of prison time would indicate he can continue to overfish and underreport with impunity. A sentence of probation would convey that this was in fact a crime of no seriousness

10

and would undermine respect for the country's environmental laws, laws regarded by many as second-tier crimes that are more nuisance than necessary. To being to effect change, Rynn must go to prison.

V.     **CONCLUSION**

For all the above reasons, the Government urges this Court to sentence Rynn to fifteen months in prison. A custodial sentence will reflect the seriousness of the conduct, promote respect for the law, and provide adequate specific and general deterrence.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

By:     */s/ Winston D. Holliday, Jr.*
WINSTON D. HOLLIDAY, JR. (#7597)
Assistant United States Attorney
1441 Main St., Ste. 500
Columbia, SC 29201
(803) 929-3079

AMY F. BOWER (#11784)
Assistant United States Attorney
151 Meeting Street, Suite 200
Charleston, South Carolina 29401
(843) 727-4381

July 18, 2025